FILED
CHARLOTTE, NC

NOV 17 2022

US DISTRICT COURT
WESTERN DISTRICT OF NC

11-14-22

Dear Honorable Judge Bell,

First I want to thank you for listening to such a trial as was conducted Sept. 19 and Sept 20 in Statesville. Please don't judge me as a person on what you heard up there. I am a man with a strong belief in our Lord God and try to live my life accordingly. I am Lay Leader and Chairman of Finance at Bess Chapel United Methodist Church in Western Lincoln County. A lot of good people put their trust in me. I am and have been Sgt. at Arms for American Legion post 100 for 19 years. I don't lie and I cannot recall a time in my life that I have ever lied about anything. My mom and Dad taught me better at a very young age. Enclosed I have a statement given to the State Highway Patrol by Sergeant Jonathan M. Futrell. There is no mention of a Key. Also he says that he spoke with Trooper Black. He

11-14-22

was told by Trooper Black why he used a Vascular neck restraint. There is a Problem. Trooper Black testified in court that he went home. Trooper Black wasn't even there. This statement was given to internal affairs on June 16, 2020. The story of the Key was later made up and rehearsed by the patrol in order to cover up the Brutal beating I received in my yard that day for no reason. My attorney let me down by removing the dates from the pictures, leaving my hospital records at the office, and by leaving personell ~~of~~ on the Jury that I had suggested removing. The perjury committed by all these officers was appalling. I ask you Judge Bell to ask the S.B.I. to investigate this incident. Please help me to bring these Purjuring Thugs to justice.

Sincerely,
Jerry Barton

FILED

HP-326B1
Page 1 of 1
Rev. 3/07

North Carolina
State Highway Patrol

# MEMBER'S STATEMENT

| Troop / District: | F/5 | Registry #: | 1896 |
|---|---|---|---|
| Rank / Name (First, M.I., Last): | Sergeant Jonathan M. Futrell | | |

**Statement**

On February 28, 2018, Trooper R.L. Neal contacted me to inform me of a use of force that had occurred at a location in Vale and at the courthouse with two separate people. Trooper Neal advised me that he was currently at the courthouse with Trooper Lee and the subjects that were involved in the separate uses of force. I responded to the Lincoln County Courthouse to assist with the processing of the individuals because one of the subjects, Jerry Baxter, wanted to speak to a supervisor. When I arrived, I began to have a conversation with Jerry Baxter. I learned that the other individual at the courthouse was Jerry Baxter's son. Jerry at first was very upset and was yelling about the way he was treated at his house. I had to ask him to calm down several times in order to understand what had happened. After calming down, I got his side of the story and then went and spoke with Trooper Neal and Trooper Black. Once I learned why Trooper Black used a vascular neck restraint, I went back to speak with Jerry Baxter. Throughout the following conversation, Jerry would get very upset and agitated. He would yell and start to stand up in an aggressive manner. I continued to keep a calm voice while speaking with him. Jerry Baxter's wife (I don't remember her name) was also present at the courthouse. At times, she was urging Jerry to calm down and sit down. Jerry would calm down and begin to have a constructive conversation with me. After explaining to Jerry why the troopers were on his property and the reason, they had to place hands on him, he would make statements that he understood and that he knew we were just doing our jobs. Just a few moments later, Jerry would again stand up, yell, and make statements that he was going to call the FBI and have us arrested for violating his rights. Jerry explained to me that he was responsible for getting three or four troopers fired in Cleveland County back in the early 1990s. He continued to brag about this incident and stated that he would get a lawyer and ensure that he would do the same to the troopers that dealt with him that day. After calming down again, he was served with the paperwork from the magistrate. He calmly shook my hand and thanked me for speaking with him. While sitting in the small claim's courtroom waiting for his son to be processed, he again got upset and agitated about being arrested. I again waited for him to calm down and talked with him until his son was processed. Throughout the entire time I was with Jerry, I noticed that he seems to be mentally unstable. One moment he was very cooperative and calm, the next he was angry and screaming about his rights being violated. He made statements that were contradicting about understanding why the troopers did what they did to threatening to have us arrested or even shot if we came back on his property.

| Initials: | JMF |
|---|---|
| Signature: | Jonathan M. Futrell (email) |
| Date: | June 16, 2020 |
| Reference: | Incident involving Jerry Baxter |

100%
Perjury

Jerry W. Baxter v. Randall L. Neal, Sr., et al. CONFIDENTIAL 000139
USDC-WDNC (File No. 5:21-CV-00025-KDB-DCK) SUBJECT TO PROTECTIVE ORDER



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Cheryl A. Nuccio, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of November 2022.

s/Cheryl A. Nuccio

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

100% Perjury see page 6



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| JERRY WAYNE BAXTER,<br>Plaintiff,<br>vs.<br>RANDALL LEE NEAL, SR., ET AL,<br>Defendants. | ) | No. 5:21-cv-25 |

TESTIMONY OF MATTHEW FUTRELL
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 20, 2022

APPEARANCES:

On Behalf of the Plaintiff:

GEORGE B. HYLER, JR., ESQ.
STEPHEN P. AGAN, ESQ.
Hyler & Agan, PLLC
38 Orange Street
Asheville, North Carolina 28801

On Behalf of the Defendant:

BETTINA J. ROBERTS, ESQ.
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, North Carolina 27603

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina



PROCEEDINGS

THE COURT: You may call your next witness.

MS. ROBERTS: At this time we would call Sergeant Matthew Futrell.

MATTHEW FUTRELL, DEFENSE WITNESS, SWORN,

DIRECT EXAMINATION

BY MS. ROBERTS:

Q. Would you please state your name for the Court.

A. Yes, ma'am. My name is Matthew Futrell.

Q. How are you employed?

A. With the North Carolina State Highway Patrol.

Q. How long have you been employed by the highway patrol?

A. Nineteen years.

Q. What is your current duty station?

A. My current duty station is Swain, Graham, Cherokee, Macon, and Clay Counties.

Q. And as of February 28, 2018, where -- what was your duty station then?

A. I was assigned as a sergeant with Catawba and Lincoln Counties.

Q. And were you present at the home of plaintiff Jerry Baxter on February 28, 2018?

A. At his residence?

Q. At his residence.

A. No, ma'am, I was not.



Q. Did you know Jerry Baxter prior to that day?
A. No, ma'am, I did not.
Q. Did you come into contact with Mr. Baxter on that day?
A. Yes, ma'am, I did.
Q. If you could please explain to the jury how you came into contact with Mr. Baxter.
A. Yes, ma'am. I received a call from Trooper Randall Neal that a use of force had occurred at a residence in Vale, North Carolina, and at the Lincoln County courthouse. He gave me a brief synopsis of what had occurred.

And then there was a Mr. Jerry Baxter at the courthouse that wished to speak to a supervisor. So I was already in Lincolnton and responded to the courthouse, and that's where Trooper Neal, Trooper Lee, Mr. Jerry, and his son were present there at the courthouse when I arrived.
Q. Okay. And so once you got to the courthouse, what did you do?
A. Spoke with my troopers briefly.

Then I could tell that Mr. Jerry was extremely upset. I took him into the small claims court. I believe his wife was present as well. And he wanted to speak to me, so we had a discussion on what had occurred.
Q. You said that he appeared upset. Could you further describe his demeanor.
A. When I first arrived he was -- he was highly agitated.



He was extremely upset. I spoke with him -- or I spoke to him in a calm manner. He would calm down. He would speak to me politely, calmly. Next thing I know he would get upset. He would leap to his feet while he was describing what happened. I would stand up with him, calm him down, sit him back down. And that went on for quite some time.

Q. What did -- strike that.

How long were you in the presence of Jerry and his wife?

A. At least an hour because they had to process his son for a separate incident and then they had to process him. So it was -- I remember being there for a while. At least over an hour.

Q. What did Jerry tell you had happened that day?

A. He explained to me that he pulled into his driveway and that there was a number of troopers present at his house. He exited his vehicle. He was trying to figure out what was going on and why they were present at his house. A struggle ensued once he was asked to put his keys down. He was taken to the ground. He said that someone put their arm around his neck. He was placed in handcuffs and brought to the magistrate's office.

Q. What did -- well, did you speak with Mrs. Baxter at all?

A. She was present, yes, ma'am.

Q. Do you recall what she told you happened on that day?

A. She stated to me that she was standing up at the door of



her residence, I believe, and witnessed -- and looked down and seen that they -- that the troopers that were present on the scene had put hands on her husband, had placed him under arrest -- or placed him in handcuffs. That's -- I didn't have much conversation with her. I think that was about all I had with her.

Q. So did Jerry go into any specifics about how he was holding his keys?

A. He denied that he was holding the keys in a knife-like manner, as in a dagger, but he did admit to me that he had the keys in his hands. He did admit that he did not drop it. He refused to drop his keys because he was on his own property.

I took the time to explain to him that the troopers felt that -- or the trooper in particular had felt that that -- the keys that he was holding was in -- held in a weapon or a type of a weapon and that he asked for him to just drop the keys for his safety and the trooper's safety.

He would state that he understood why he was asked to drop the keys, but admitted that he refused to drop the keys.

Q. Did he discuss -- strike that.

When you were in the presence of Mrs. Baxter, could you explain -- I mean could you describe your observations about her physical health.

A. Her physical health?

Q. Or physical condition.



A. Yes, ma'am. She appeared normal. She had her head down. Had her hand in her head several times. There was a couple times that Jerry would walk off and she made statements to me that she apologized or that she was sorry. She would have to calm Mr. Jerry down several times. When I was trying to calm him down, she would have to take -- tell Jerry, "Listen, please calm down. Quit yelling." He would, and then we would continue our conversation.

Q. Did you have an opportunity to observe Mrs. Baxter walking or standing?

A. Yes, ma'am.

Q. Did she appear to be injured in any way?

A. No, ma'am.

Q. Did Mrs. Baxter say anything to you about any injuries?

A. No, ma'am.

Q. Did Mr. Baxter say anything to you about injuries?

A. Yes, ma'am.

Q. What did he say about injuries?

A. He said his wrists were hurt. I looked at his wrist and took a picture of the wrist per our use of force and there was slight bruising, maybe just a little bit of redness around his wrist.

Q. At any time were you asked to provide or determine if there was video evidence in this case?

A. Repeat that question, I'm sorry.



Q. At any time were you asked to determine whether or not there was video footage or video evidence in this case?

A. Yes, ma'am.

Q. And so what was your process in trying to determine whether or not there was video evidence?

A. Well, I interviewed each trooper that was on scene with their patrol cars. I remember one trooper in particular was in a spare patrol car. His assigned patrol car was under maintenance, or something to that effect, so it didn't have a video camera in it.

Once I determined how the patrol cars were parked, that they wouldn't have picked up the use of force, I did go back to a trooper's car and did a record-after-the-fact on the WatchGuard in-car camera and it did not pull anything up.

Q. And was that Trooper Craig's vehicle?

A. (No response.)

Q. Only if you recall. That's fine.

A. It's been four years and I don't recall which trooper car it was; but I do remember, you know, doing a record-after-the-fact on a video.

Q. Now, when you did the record-after-the-fact, were you able to see the house or the yard or any of the property of Mr. Baxter?

A. It was the house and there's -- on a record-after-the-fact it's a digital process so there's no



audio. It's only visual. So when I did the record-after-the-fact for the entire time that they pulled in to after the conclusion of the use of force, it was just a picture, I think, of a rear of a patrol car and a house.

Q. So you never saw Mr. Baxter's blue passenger vehicle.

A. No, ma'am.

Q. You said that Mr. Baxter was kind of going back and forth between being upset and being calm. Could you just -- what are some of the things he was saying while he was upset?

A. He made comments that the troopers violated his rights. He would make comments that he was going to contact the FBI and have us all arrested. Made other comments that if we came back onto his property, this time he would be ready and we would be shot.

Q. And while he was calm, what sorts of things was he saying to you?

A. Several times he apologized for how he was acting. He said, "I'm sorry that I -- I'm upset for the way that I was treated at my house. I understand that you're just doing your job."

When he was calm it was a very constructive conversation. It was like a conversation you and I are having, but in a moment it would turn very agitated and he was extremely upset to being calm, back and forth.

MS. ROBERTS: Those are my questions at this time.



THE COURT: You may cross examine.

CROSS EXAMINATION

BY MR. HYLER:

Q. You indicated you saw the -- his wrist and you observed, I don't know how you described it, minor redness or something.

A. Slight bruising.

Q. Slight bruising.

A. Yes, sir.

Q. Could you look at what the jury has seen, which is Plaintiff's Exhibit Number 9. Does that appear to be Mr. Baxter?

A. Yes, sir. Yes, sir, that's Mr. Jerry.

Q. And that's what you're describing as slight bruising?

A. I don't recall it being that dark, no, sir.

Q. Okay. Now, let me ask you this. You know that we asked in our discovery that we get all the dash cam video.

A. Yes, sir.

Q. And there was a reply that there wasn't anything that showed the use of force.

A. Yes, sir.

Q. But now you're saying there was a video that showed the house.

A. Yes, sir. I reviewed a video on the actual -- in the car of the house. And once I determined that there was no use of force, there was no audio, it was nothing but just the rear of



a patrol car and the residence, I did not download it and make it a video. I just viewed it on the actual screen that's inside the patrol car.

Q. So there was video of what would have shown Ms. Baxter going in and out of the house.

A. No, sir.

Q. If she --

A. No, sir, there was no person. It was just -- it was the -- a rear of a patrol car and a house. I don't even -- I'm pretty sure it didn't even show the front door because there was no person on the video whatsoever.

Q. So it didn't pick up anything.

A. No, sir.

Q. And you didn't provide that to us to let us see what was there or not there that might have been relevant to all of the issues in the case, not just the use of force incident.

A. At that point I was acting under state highway patrol policy in that, you know, there was no video evidence of that so at that time I was just acting under my job as a supervisor. And once I deemed that there was no video, there was -- I did not turn it into the use-of-force board or -- I believe in my blue team statement, which is our use-of-force statement, I did describe how the patrol cars were parked and that there was a reason why there was not a video to our use-of-force board.



Q. And I take it you looked at all six cars' video?

A. Once I looked at that video and deemed that there was no chance that there was going to be a video of anything, no, I did not.

Q. So you didn't look at the other five; you just looked at one.

A. No, sir, I did not.

Q. Now, let me ask this. You said Mr. Baxter got agitated and told you he was upset about the way he got treated.

A. Yes, sir.

Q. He was angry.

A. Yes, sir.

Q. You didn't have to put him in a chokehold and hold him down to calm him down, did you?

A. It was not a chokehold; it was a vascular neck restraint. But no, sir.

Q. Whatever it is, you didn't have to do it, did you? I'm not an expert. You didn't have to hold him down or get other officers in there to tackle him or anything.

A. No, sir. I was in a controlled environment, the courthouse, with, you know, other law enforcement officers there. So, no, sir, I didn't feel threatened and he didn't have anything in his possession.

Q. The people at the scene had other law enforcement officers there. There were six of them there with Mr. Baxter



by himself.

A. Yes, sir.

MR. HYLER: No further questions.

THE COURT: Any redirect?

MS. ROBERTS: Briefly.

REDIRECT EXAMINATION

BY MS. ROBERTS:

Q. Sergeant Futrell, are all the cameras that were in the vehicles back in 2018 capable to do the record-after-the-fact?

A. No, ma'am. We were in a transition from one WatchGuard program to the next. The old WatchGuard camera is the one that I had. It -- it was a different program. It wasn't able -- the new WatchGuards that we have are much more sophisticated and can save a lot more data.

Q. In 2018 with the older cameras, how long do the videos if they are downloaded to, I guess, the DVD or to the server, or whatever, how long do they last?

A. I believe the highway patrol policy at that time was 90 days.

Q. And when you -- strike that. When you were in the small claims courtroom with Mr. Baxter --

A. Yes, ma'am.

Q. -- did he have his keys in his hands?

A. No, ma'am.

Q. Did he have any weapon?



A. No, ma'am.

MS. ROBERTS: Those are my questions.

THE COURT: All right. Thank you.

MR. HYLER: No further questions.

THE COURT: You may stand down.

THE WITNESS: Thank you.

(Witness stepped down.)

*****